## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**KEITH VERRETT**                                    **CIVIL ACTION**

**VERSUS**                                                **NO. 14-1854-SS**

**JEH JOHNSON, SECRETARY**

## ORDER AND REASONS

For the reasons described below, the motion of the defendant, Jeh Johnson, Secretary of the Department of Homeland Security ("Defendant"), for summary judgment is granted.

### Procedural Background

On August 14, 2014, Keith Verrett ("Verrett") filed a complaint against Defendant alleging that he was terminated in violation of Title VII, 42 U.S.C. 2000e.  The parties consented to proceed before the assigned Magistrate Judge.  Rec. doc. 12.  Defendant filed a motion for summary judgment.  Rec. docs. 19-21.  It was briefed.  Rec. docs. 25 and 28.

### Verrett's Allegations

Verrett, an African-American male, alleges that:  (1) he was employed by the Transportation Security Administration ("TSA") at Armstrong International Airport ("Armstrong Airport") as a transportation security officer ("TSO"); (2) he was so employed for ten years of satisfactory performance when he was wrongfully terminated on March 6, 2013 in a one-step removal process; (3) his alleged offense was stealing a few quarters out of a bowl left at a checkpoint; (4) he did not steal any quarters; (5) Defendant based the termination on an alleged violation of Management Directive 1100.75-3 ("Directive"); (6) he was treated differently and more adversely than white TSOs who violated the Directive for unacceptable conduct and performance; (7) the white TSOs who violated the Directive and were not terminated were Joshua Bryant, Cynthia Casler and Alicia Rockwell; (8) for example, Rockwell allegedly

allowed a passenger and a passenger's luggage to avoid being screened prior to boarding an aircraft; (9) the same manager, Randell Lundsgaard, who supervised Verrett also supervised the white TSOs; (10) the Directive leaves no room for discretion except when the senior TSA official at Armstrong Airport, the Federal Security Director, documents mitigating factors; (11) during Verrett's ten years of employment no exceptions to the Directive's mandate were lodged; (12) TSA at Armstrong Airport has a pattern of disparate discipline; (13) at the time of his removal, TSA at Armstrong Airport was aware that numerous items had been taken from checkpoint bowls; (14) Defendant lacked proof that he had stolen the coins; and (14) Defendant chose not to search him for the coins which would have exonerated him.

## Summary Judgment Standard

Fed. R. Civ. P. 56 provides in pertinent part that summary judgment will be granted when "... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); Lujan v. National Wildlife Federation, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990). To that end, the court must "view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  Wyatt v. Hunt Plywood, 297 F.3d 405, 409 (5th Cir. 2002).  Where the record taken as whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986);  Washington v. Allstate Ins. Co., 901 F.2d 1281 (5th Cir. 1990).

Furthermore, the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.

<u>Celotex</u>, 106 S.Ct. at 2553;  <u>see Lujan</u>, 110 S. Ct. at 3187.  If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response.  If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  <u>Celotex</u>, 106 S.Ct. at 2553-54.  A dispute over a material fact is genuine, if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Kee v. City of Rowlett Texas</u>, 247 F.3d 206, 210 (5th Cir. 2001).

This burden is not satisfied with "some metaphysical doubt as to the material facts," <u>Matsushita</u>, 106 S.Ct. at 1356, by "conclusory allegations," <u>Lujan</u>, 110 S. Ct. at 3180, or by only a "scintilla" of evidence, <u>Davis v. Chevron U.S.A., Inc.</u>, 14 F.3d 1082 (5th Cir.1994).  The court resolves factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.  The court does not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.  <u>See Lujan</u>, 110 S. Ct. at 3188.   Summary judgment is appropriate in any case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant."  <u>Armstrong v. City of Dallas</u>, 997 F.2d 62 (5th Cir.1993).  If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted.  <u>See Evans v. City of Bishop</u>, 238 F.3d 586, 588-89 (5th Cir. 2000).

In <u>Fierros v. Texas Dept. of Health</u>, 274 F.3d 187 (5th Cir. 2001), the Fifth Circuit cautioned that summary judgment is not favored in claims of employment discrimination and that the Supreme Court in <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S.Ct. 2097, 2110 (2000), emphasized the paramount role that juries play in Title VII cases, stressing that in evaluating summary judgment evidence, courts must refrain from the making of

credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, which are jury functions, not those of a judge.  <u>Fierros</u>, 274 F.3d at 190-91.

## **Arguments of the Parties**

Defendant contends that Verrett cannot satisfy the requirements for a *prima facie* case because he cannot show that he was treated less favorably than other similarly situated employees outside the protected group.  It urges that none of the alleged employment actions involving the three "comparators" occurred under nearly identical circumstances.  None of them were terminated for theft.

Assuming Verrett can establish a *prima facie* case, Defendant argues it articulated a legitimate, non-discriminatory reason for the termination.  He was terminated for theft, a violation that must be punished with termination.

Defendant urges that Verrett cannot come forward with any competent summary judgment evidence indicating that its articulated reason is pretextual.  Verrett has no evidence that Defendant terminated him for some reason other than theft.

Verrett contends there are four issues of disputed fact which preclude summary judgment.  First, he denies that he stole any quarters from the divesture or checkpoint bowl.  Second, Defendant has no credible evidence that he stole any quarters from a checkpoint bowl.  Third, the one-step removal process failed to comply with the mandate for pre-decisional discussion prior to removal.  Fourth, Defendant's application of the Directive was inconsistent and discriminatory in that three white TSO's were not removed for violations of the Directive which were similar to or more egregious than the allegation that Verrett stole some quarters.

The allegation of theft is at the center of the case.  In support of its motion for summary judgment, Defendant states:  (1) Verrett was terminated pursuant to TSA policy because he

committed theft—an offense for which removal is mandatory (Rec. doc. 19 (Memorandum at 12); (2) the alleged comparators, by contrast, did not commit theft (Id. at 12-14 and 16); (3) Verrett committed theft, an offense for which he must be terminated in the interest of maintaining public trust in the TSA, and therefore Defendant articulated a legitimate, non-discriminatory reason for his termination (Id. at 18); and (4) he cannot show that Defendant's legitimate reason for termination was pretextual because there is no evidence that Defendant terminated him for some reason other than theft (Id. at 22).

## Undisputed Facts Concerning Allegation of Theft

**1. Background**.

TSA hired Verrett, an African-American male, as a Transportation Security Officer ("TSO") at Armstrong Airport in October 2002.  TSOs conduct screening operations.  Rec. doc. 20 (Exhibit O - Deposition of Keith Verrett ["Verrett Dep."] at 25); and Rec. doc. 21 (Declaration of Carlen Bourgeois ["Bourgeois Decl."] at para. 4).

At the time of Verrett's termination, the TSA chain of command at Armstrong Airport for screening operations was:

Federal Security Director ("FSD")
(Johnny Eason)
∧
Assistant Federal Security Director for Screening Operations ("AFSD-S")
(Timothy Berroyer)
∧
Deputy Assistant Federal Security Director for Screening Operations ("DAFSD-S")
(Burns Gilbert)
∧
Transportation Security Managers ("TSMs")
∧
Supervisory TSOs ("STSOs")
∧
Lead TSOs ("LTSOs")
∧
Transportation Security Officers ("TSOs")

Bourgeois Decl. para. 8; Rec. doc. 21 (Declaration of Timothy Berroyer ["Berroyer Decl."] para. 6); and Rec. doc. 20 (Exhibit G - 2012 Armstrong Airport Organizational Chart).

The LTSOs supervising Verrett rotated frequently and no LTSO participated in the events leading to Verrett's termination. Verrett Dep. 29-30; Bourgeois Decl. para. 9; and Berroyer Decl. para. 7.

Verrett's chain of command at the time of his termination was:

FSD  Johnny Eason ("Eason").
∧
AFSD-S  Timothy Berroyer ("Berroyer")
∧
DAFSD-S  Burns Gilbert ("Gilbert")
∧
TSM Miladin "Misha" Mutavdzic ("Mutavdzic") and/or
TSM Randell "Randy" Lundsgaard ("Lundsgaard")
∧
STSO Keith Osborne ("Osborne")
∧
TSO Verrett

Bourgeois Decl. para. 9; and Berroyer Decl. para. 7.

**2. <u>Coins and Other Items Left Behind by Passengers</u>.**

Passengers go through lanes as they pass through security. Rec. doc. 25 (Exhibit 8 - Deposition of Keith Osborne ["Osborne Dep."] at 55). There are checkpoint bowls on the lanes for the passengers to place coins, ballpoint pens and other items. Osborne Dep. 38.[1] These items can be screened separately, and will not trigger an alarm when a passenger walks through the metal detectors. Bourgeois Decl. para. 16; and Berroyer Decl. para. 9. Every day coins, pens and other items are left behind by passengers as they pass through the checkpoint lanes. Osborne Dep. 38-39.

---

[1] These bowls are sometimes referred as divesture bowls. Rec. doc. 19 (Memorandum at 3).

Set off from the checkpoint lanes is a podium.  Osborne Dep. 54.  Passengers are not allowed in the area of the podium (sometimes referred to as Supervisor's podium).  Osborne Dep. 54.  On most occasions Supervisor STOs are stationed at the podium overseeing the checkpoint. Osborne Dep. 42-43.  Everything that is left behind by passengers comes to the podium. Osborne Dep. 40.  Coins are kept in a bowl at the podium.  Osborne Dep. 39-40.

At the end of a shift the coins are counted by the supervisor on duty.  Osborne Dep. 39-41.  On many occasions Osborne counted the coins.  Osborne Dep. 41.  Another STSO or LTSO double counts the coins to make sure the count is correct.  Osborne Dep. 41.  After they are counted, they are put in an envelope.  Osborne Dep. 40.  A log on the front of the envelope is completed.  It indicates who counted the coins, the value of the coins, and where the envelope was left for tracking purpose.  Osborne Dep. 41.  The envelope is then turned into the office. Osborne Dep. 40. [2]

Pens and other items left by passengers are tagged and placed on the side for collection at the end of the day by the TSA office that takes care of left behind items.  Osborne Dep. 39.

Passengers use the checkpoint bowls on the lanes.  They do not use the bowl on the podium.  Osborne Dep. 55.

**3.  <u>Sunday, February 24, 2013</u>.**

On Sunday, February 24, 2013, Osborne, a Supervisor STO, noticed quite a bit of change (at least a few dollars in change) in the podium bowl before he went to lunch.  Osborne Dep. 43;

---

[2]  Abandoned change is considered to be government property.  Bourgeois Decl. para. 17.  The United States Code expressly states that any money left unclaimed at a security checkpoint "shall be retained by the Transportation Security Administration and shall remain  available until expended for the purpose of providing civil aviation security." <u>See</u> 49 U.S.C. § 44945.  In fiscal year 2014, TSA collected approximately $675,000.00 in unclaimed money at airports across the United States.  In fiscal year 2014, TSA collected over $5,500.00 at Armstrong Airport.  Rec. doc. 20 (Exhibit M -TSA Report page 6).

and Rec. doc. 20 (Exhibit H page 13 - Statement of Miladin Misha Mutavdzic ["Mutavdzic Statement"]).  When he returned from lunch, there "seemed to be quite a bit less change in the bowl."  Osborne Dep. 43.  He did not count it.  Osborne Dep. 43.  The other Supervisor STOs on the checkpoint did not report anyone coming up to the podium bowl or if any of the change in the podium bowl was put in an envelope and moved.  Osborne Dep. 43.  Osborne was not aware of other occasions where money was missing from the bowls.  Osborne Dep. 46.

Osborne called Transportation Security Manager Mutavdzic and reported the incident to him.  Osborne asked Mutavdzic if he could see anything on the video footage.  Osborne Dep. 44.

Mutavdzic reported that on Sunday, February 24, 2013, at about 6:00 p.m., Osborne informed him that multiple quarters were missing from the bowl located on the Supervisor's desk on Checkpoint D.  Mutavdzic Statement.  Osborne and Mutavdzic could not locate a camera view with a direct line of sight overlooking the Supervisor's podium.  Mutavdzic Statement.[3] Osborne asked Mutavdzic to see that a camera be placed facing the podium.  Osborne Dep. 45.

On Monday, February 25, 2013, when he reported for duty at about 1:00 p.m., Mutavdzic related the incident at Checkpoint D to DAFSD-S Burns Gilbert and asked if he could arrange to have the camera rotated so the podium was observed.  Mutavdzic Statement.  The camera was placed as Osborne requested.  Osborne Dep. 45 and 47.

**4.  Tuesday, February 26, 2013.**

Osborne and Mutavdzic decided to mark quarters with a black felt-tipped pen and place them in the podium bowl.  Osborne Dep. 48 and 50.  Osborne listed these marked quarters by year.  Osborne Dep. 49-50.  The marked quarters were put in the bowl with the other coins

---

[3] On deposition cross-examination, Osborne was asked if the video footage could confirm that the amount of coins in the bowl before Osborne went to lunch was greater than the amount of coins in the bowl after he returned.  Osborne Dep. 44.  Osborne responded it could not.  Osborne Dep. 45.

already in the bowl.  Osborne Dep. 50.  Osborne did not count the change in the bowl.  Osborne

Dep. 50-51.  Unless it was recorded on video, no one witnessed Osborne putting the marked

quarters into the bowl.[4]  Osborne Dep. 52.  Osborne reported to his supervisors that he had put

the marked quarters into the bowl.  Osborne Dep. 52.

 While the marked quarters were in the podium bowl, Osborne went about his normal

duties.  After the marked quarters were in the podium bowl, Osborne went to eat for about half

an hour.  Osborne Dep. 53.  On February 26, 2013, at approximately 7:00 p.m., Osborne

noticed that the divesture bowl contained less change than it had previously. He checked the

contents of the bowl and discovered that at least two, but not all, of the marked quarters

were missing.  Rec. doc. 20 (Exhibit H - Removal File pages 13 and 16); and Osborne Dep. 53-

54. Osborne reported the missing quarters to Mutavdzic.  Id.

 During this time, there were passengers coming through the checkpoint lanes.  Osborne

Dep. 53.  The passengers did not go by the bowl with the marked coins because it was on the

podium which is set back off from the checkpoint.  Osborne Dep. 54.

**5.  Reviewing Video Footage from February 26, 2013.**

 On February 26, 2013, at about 8:00 p.m., Osborne reported to Mutavdzic that multiple

quarters were missing from the bowl located at the Supervisor's podium on Checkpoint D.

Mutavdzic Statement.   Mutavdzic reviewed the video footage "and without any doubt,

positively identified TSO Keith Verrett removing the quarters from the bowl and placing them

in his right pants pocket."  Mutavdzic Statement.  Some of the quarters Osborne and Mutavdzic

placed in the bowl were missing from the bowl.  Mutavdzic Statement.  On that date, the bowl

---

[4]  TSM Randell Lundsgaard reviewed the video footage and observed Osborne making note of identifying marks on
coins in the bowl at the Supervisor's podium at 1:14 p.m.  Infra 11.

contained only loose change.  Bourgeois Decl. para. 18; Berroyer Decl. para. 8; and Rec. doc. 20 (Exhibit B – Report of Investigation page 00086).

Near the end of the shift, Mutavdzic showed Osborne a portion of the video footage. Osborne Dep. 56-57.  It showed a person walk up to the podium while no one was around the podium.  The person put a hand into the bowl.  Osborne Dep. 55.  Osborne could not see what was in the hand.  Osborne Dep. 56.  The hand went into the person's pocket.  Osborne Dep. 55. Osborne could not see what was put in the pocket.  Osborne Dep. 56.  The person walked off. Osborne Dep. 55.  The person looked like Verrett.  Osborne Dep. 56.

Osborne was not shown the entire footage.  Osborne Dep. 55.  Verrett was still at work when Osborne was shown the video.  Osborne did not ask Verrett about the incident.  Osborne did not search Verrett.  Osborne Dep. 57.

On February 26, 2013, at approximately 7:35 p.m., Mutavdzic asked STSO Jeffrey Buras to review the video footage.  Buras observed Verrett walk past the Supervisor podium once, then turn around and approach the podium.  He appeared to place his hand inside the coin bowl on top of the podium, remove items from the bowl, then walk away, and place items inside his pants pocket.  The video ended when Verrett left the screen.  Rec. doc. 20 (Exhibit H – Removal File page 14 [Statement of Jeffrey Buras ("Buras Statement")]).

On February 26, 2013, in the early evening, Mutavdzic and Osborne asked Lynda S. Shouse to view video footage.  She observed Verrett approach the Supervisor's podium, pass it up to get something from the top of the supply cabinet, turn around, and walk back to the podium.  He stopped, looked into the bowl on top of the podium, he reached into the bowl, removed a handful of items in the bowl, turned around, and put the items in his pocket as he was

walking away from the podium.  Rec. doc. 20 (Exhibit H – Removal File page 15 - Statement of Linda Shouse).

TSM Randell Lundsgaard was asked to review the video footage, make notes of what he saw, and create a narrative of what he saw on the video.  Rec. doc. 25 (Exhibit 14 - Deposition of Randell Lundsgaard ["Lundsgaard Dep."] at 16).  On March 1, 2013, Lundsgaard reviewed the footage for February 26, 2013 from 12:37 p.m. until 7:30 p.m.  Osborne was seen in the video at 1:14 p.m. making note of identifying marks on coins in a blue divestment bowl at the Supervisor's podium.  At approximately 2:27 p.m., STSO Buras appears to count the coins in the blue bowl at the Supervisor's podium.  No other personnel approached the bowl until about 6:11 p.m. when Verrett approached the bowl.  No other persons reached into the bowl until about 7:01 p.m. when Osborne inspected the contents.  At no time did Lundsgaard see any person other than Verrett appear to remove or even touch the bowl at the Supervisor's podium other than Osborne and Buras as noted.  Rec. doc. 20 (Exhibit H – Removal File page 17 [March 1, 2013 Statement of Rendell Lundsgaard ("Lundsgaard Statement")]); and Lundsgaard Dep. 18.

Lundsgaard was told that a few coins were placed in the bowl.  He did not know the exact amount.  He did not count the coins in the bowl.  His information on what was put into the bowl and what was taken out of the bowl was based on what he was told.  Lundsgaard Dep. 12.  He could not tell from the video whether Verrett had any coins in his hand or whether he put any coins in his pocket.  Lundsgaard Dep. 14.

**6.  <u>Response to the Incident</u>**.

Mutavdzic reported his findings to Gilbert and AFSD-S Timothy Berroyer,  and requested authorization to begin preparing Verrett's Pre-Disciplinary Discussion paperwork.  Rec. doc. 20 (Exhibit I - E-mails page USA2061).

According to Mutavdzic, "termination [was] the only course of action [he] would recommend" to his superiors because Verrett's actions constituted "theft while on duty." Id.

Osborne made no recommendation on whether Verrett should be terminated.  It was not his call.  Osborne Dep. 59.  He did not participate in any  pre-removal discussions or discipline.  Osborne Dep. 59; and Berroyer Decl. para. 13.  Lundsgaard made no recommendation on whether Verrett should be terminated.  Lundsgaard Dep. 20; and Berroyer Decl. para. 13.

On February 27, 2013, Mutavdzic and Lundsgaard met with Verrett to conduct the Pre-Disciplinary Discussion.  Rec. doc. 20 (Exhibit H - Removal File pages 9-10).  During that discussion, Mutavdzic informed Verrett that he had been observed on the television footage removing money from the divesture bowl and that he was permitted to respond to the allegation orally and in writing.  Id.

Verrett chose to respond in writing.  "It was said that I took money from a bowl  at the supervisor podium which I did not do."  Rec. doc. 20 (Exhibit H – Removal File page 11).  Verrett viewed the relevant television footage on March 2, 2013.  After viewing it, Verrett was given the opportunity to amend his written statement and he chose not to  do so.  Id. page 18.  Instead, he took sick leave for the remainder of that day as well as for the following two days.  Id. pages 4 and 8; and Rec. doc. 20 (Exhibit I - E-mails page USA2057).  Upon his return to work, he was terminated effective immediately for "theft."  Rec. doc. 20 (Exhibit H – Removal File page 3; Exhibit I - E-mails page USA2052).

At the time of Verrett's termination, Berroyer was the highest-ranking TSA  employee at Armstrong Airport with direct and principal responsibility for screening operations.  Berroyer Decl. at para. 2.  He was the deciding official who determined that Verrett's actions required his  removal.  Id. paras. 14 and 20; and Exhibit H - Removal File pages 3-8.  Berroyer

drafted and signed Verrett's Notice of Removal.  Berroyer Decl. at para. 15.  After reviewing the evidence, Berroyer determined, by a preponderance of the evidence, that Verrett committed theft.  Berroyer Decl. paras. 14 and 16.

Berroyer consulted TSA Management Directive 1100.73-5, *Employee Responsibilities and Conduct*; Directive 1100.75-3, *Addressing Unacceptable Performance and Conduct*; and the relevant TSA handbook sections and policies relating to those Directives.  Berroyer Decl. para. 17; and Exhibit H - Removal File pages 5-6.

TSA policy requires a TSO who has committed theft be terminated, unless the TSO requests an exception from the Deputy Assistant Administrator for TSA's Office of Security Operations (the office which oversees checkpoint operations) or the Director of TSA's Office of Professional Responsibility.  Rec. doc. 20 (Exhibit C – Management Directive 1100.73-5; Exhibit D – Management Directive 1100.75-3; Exhibit E - Handbook to Directive 1100.75-3 [Appendix A at USA129]; and Exhibit F - Table of Offenses and Penalties at pages USA429 and 453).

Verrett did not request an exception from the Deputy Assistant Administrator for TSA's Office of Security Operations or the Director of TSA's Office of Professional Responsibility.  Bourgeois Decl. paras. 21-22; and Berroyer Decl. paras. 18-19.

Mutavdzic and Lundsgaard hand-delivered the Notice of Removal to Verrett on March 6, 2013.  Rec. doc. 20 (Exhibit H - Notice of Removal pages 7-8; Exhibit I - E-mails page USA2052).  Verrett refused to sign the notice to acknowledge receipt of the Notice of Removal.  Rec. doc. 20 (Exhibit H - Notice of Removal pages 7-8; and Exhibit I - E-mails page USA2052).

13

**7.  Verrett's Administrative Appeal**.

On April 2, 2013, Verrett filed an appeal of Berroyer's decision with TSA's Office of  Professional Responsibility Appellate Review Board ("OAB").  Rec. doc. 20 (Exhibit J - OAB Appeal).  Verrett stated that, although he denied taking any quarters, he admitted that he removed a "smiley face button" from the divesture bowl.  Id. at page 11.  He also admitted at his deposition that he took the smiley face button.  Verrett Dep. 34-35.  Based on Verrett's admission of theft of an item from the divestiture bowl, the OAB  upheld his removal as proper on May 14, 2013.  Rec. doc. 20 (Exhibit K - OAB Decision pages 2-3).

When denying Verrett's appeal, the OAB emphasized that "TSOs are in a unique position within the agency, in that they often have access to passengers' personal property. Any theft, regardless of the value of the property, may serve to erode the trust that management has in the employee, and the trust the traveling public has in TSA."  Id. (OAB Decision page 3).

Verrett contacted an EEO counselor on April 2, 2013.  He filed a formal EEO complaint on July 5, 2013, alleging that he was disparately treated based on his race when he was terminated.  His EEO claim was accepted for investigation on August 9, 2013.  The DHS Office for Civil Rights and Civil Liberties issued its Final Agency Decision  on June 25, 2014, concluding TSA did not discriminate against Verrett when he was  terminated. Rec. doc. 20 (Exhibit B – Report of Investigation).

### Allegation of Theft

The parties disagree on the burden of proof that confronts the Defendant in response to the allegation of theft.  Defendant states that removal is mandatory when a TSO is found—by a preponderance of the evidence—to have committed theft.  Rec. doc. 19 (Memorandum at 6 and 19); and Rec. doc. 28 at 5.

Directive 1100.75-3 provides TSA policies and procedures for the use of non-disciplinary, disciplinary, and adverse actions to address unacceptable employee performance and conduct.   Rec. doc. 20 (Exhibit D – Management Directive 1100.75-3 Part 1).   For procedures it refers to the part of the Handbook addressing Unacceptable Performance and Conduct.  Id. Part 7.

The Handbook was effective January 2, 2009; it was published on that date; and it was revised on December 20, 2012.  Rec. doc. 20 (Exhibit E – page 1).  Verrett cites to a copy of a Handbook to TSA MD 1100.75-3.  Rec. doc. 25 (Exhibit 15).  This Handbook was revised on February 12, 2014, a year after the incident.  Id.  Defendant's Exhibit E, the Handbook revised on December 20, 2012, was in effect at the time of the incident.

Defendant's Exhibit E states that, "[o]ne-step actions must meet the preponderance of the evidence standard of proof."  Rec. doc. 20 (Exhibit E – page 9).  It defines preponderance of evidence as that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a purported fact is more likely to be true than untrue.  Id. - page 4.

Verrett states that prior to imposing penalties, management was required "to review all relevant evidence to ensure that the action taken meets the requirements of the preponderance of evidence standard *or the substantial evidence standard of proof*."  Rec. doc. 25 at 5 (Emphasis in original).  Verrett is citing from the Handbook revised in February 2014.  Rec. doc. 25 (Exhibit 15 page 7).  The Handbook revised on December 20, 2012 did not refer to the substantial evidence standard of proof.[5]  Rec. doc 20 (Exhibit E).

---

[5]  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).

Verrett also refers to Directive 1100.74.5.  Rec. doc. 25 (Statement of Disputed Facts Nos. 46 and 47).  Verrett does not attach Directive 1100.74.5 as an exhibit.  In its reply, Defendant notes that Verrett frequently cites Directive 1100.75.4, but states no such Directive exists.  Rec. doc. 28 at 5, n. 10.  Verrett refers to Directive 1100.75.4 as requiring clear and convincing evidence for theft.[6]  Rec. doc. 25 (Statement of Disputed Facts Nos. 46 and 47).  Verrett has not demonstrated that this is the burden of proof required of the Defendant on the allegation of theft.

For TSA to determine that Verrett had committed theft, the burden of proof was a preponderance of the evidence.  This simply means evidence that persuades the finder that a fact is more likely true than not true.  Pattern Instructions, Part 2.20.  As measured by this standard, the undisputed facts demonstrate that Verrett removed quarters from the bowl on the Supervisor's podium.

On Defendant's motion for summary judgment is there a genuine issue of material fact as to whether Verrett removed quarters from the bowl on the Supervisor's podium on February 26, 2013?   In considering this issue, the Court must refrain from making credibility determinations, weighing of the evidence, and drawing of legitimate inferences from the facts, which are jury functions, not those of a judge.  Fierros, 274 F.3d at 190-91.  While fully cognizant of this restraint and viewing the facts and inferences in the light most favorable to Verrett, the record taken as a whole could not lead a rational trier of fact to find for Verrett on

---

[6]

> Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction as to the matter at issue.  This involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard; however, proof to an absolute certainty is not required.

Fifth Circuit, Pattern Jury Instructions – Civil (1999) Part 2.14 ("Pattern Instructions").

the issue of theft.  The evidence on this issue is not such that a reasonable jury could return a

verdict for the non-moving party.

The video footage showed that after Osborne was seen at 1:14 p.m. making note of

identifying marks on coins in the bowl at the Supervisor's podium and at 2:27 p.m., when Buras

appeared to count the coins, no other personnel approached the bowl until after 6:00 p.m. when

Verrett approached the bowl, reached into it, and put his hand in his pocket.  No other person

reached into the bowl until about 7:00 p.m. when Osborne inspected the contents.  Osborne

reported that at least two of the marked quarters were missing.

## Analysis

### 1.  Verrett's *Prima Facie* Case.

> To establish a *prima facie* case of racial discrimination in employment, an
> employee must demonstrate that (1) he is a member of a protected class, (2) he
> was qualified for the position at issue, (3) he was the subject of an adverse
> employment action, and (4) he was treated less favorably because of his
> membership in that protected class than were other similarly situated employees
> who were not members of the protected class, under nearly identical
> circumstances.

Lee v. Kansas City S. Ry. Co., 574 F.3d 253, 259 (5th Cir. 2009).

The first three elements are present.  Defendant contends that Verrett does not satisfy the

fourth element because none of the three "comparators" identified by Verrett committed theft.[7]

In Lee, the Fifth Circuit stated that.

> [T]he plaintiff's conduct that drew the adverse employment decision must have
> been "nearly identical" to that of the proffered comparator who allegedly drew
> dissimilar employment decisions. . . .
>
> We do not, however, interpret "nearly identical" as synonymous with
> "identical."  Applied to the broader circumstances of a plaintiff's employment and

---

[7]  At the administrative level, Verrett contended there were six comparators.  Defendant's memorandum
in support of its motion for summary judgment discusses all six.  Verrett's opposition memorandum only
refers to three comparators.

that of his proffered comparator, a requirement of complete or total identity rather than near identity would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical.

574 F.3d at 260 (footnotes omitted).

In <u>Lee</u>, an African-American railroad engineer was terminated for disregarding a block signal that indicated he had to stop the train and in failing to contact his dispatcher for authorization to proceed.   Within the previous eighteen months, there were two other moving violations that resulted in his suspension.   The engineer was fired, and he was not granted leniency which would have led to reinstatement.   <u>Id</u>. at 261.   A white railroad engineer, Bickham, failed to halt his train at a stop signal and was fired.   Bickham had a like number of moving violations.   Unlike the plaintiff in <u>Lee</u>, Bickham was granted leniency and reinstated.

The Fifth Circuit concluded:

We are satisfied that employment histories marked by a comparable number of serious moving violations by train engineers who perform the same job are sufficiently similar to require comparison of the two when, as here, the final violations-failing to obey a stop signal-are indistinguishable.

<u>Id</u>. at 261-62.

In <u>Lee</u>, the Fifth Circuit cited <u>Wyvill v. United Cos. Life Ins. Co</u>., 212 F.3d 296, 302 (5th Cir. 2000), and stated:

We have considered the requirement for one employee to be similarly situated to another on any number of occasions.  Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated.

574 F.3d at 259 (footnote omitted).

Verrett appears to suggest that the standard described in <u>Wyvill</u> and applied in <u>Lee</u> is not correct.  Rec. doc. 24 at 12-13.  He cites an unpublished opinion, <u>Harvey Hoffman v. Baylor Health Care System</u>, No 14-10258 (5th Cir. January 6, 2015).  In <u>Harvey Hoffman</u>, the Fifth

Circuit cites <u>Wyvill</u> and states that "[i]n order for the disparate treatment to be probative of discriminatory animus, however, the plaintiff must present comparator employees of sufficient similitude." <u>Id</u>. at 6-7 (footnote omitted).  It also states that "we require that the relevant employment actions take place 'under nearly identical circumstances.'" <u>Id</u>. at 7-8 (citing <u>Lee</u>). <u>Harvey Hoffman</u> is not a departure from <u>Wyvill</u>.  It is entirely consistent with <u>Wyvill</u> and <u>Lee</u>.

Verrett also relies on <u>Young v. United Parcel Service, Inc.</u>, ____ U.S. ____, 135 S.Ct. 1338 (March 25, 2015).  At issue in <u>Young</u> was a claim under the Pregnancy Discrimination Act. The Supreme Court noted that the approach described in the decision is limited to the Pregnancy Discrimination Act.  <u>Id</u>. at 1355.

Verrett contends that he was treated less favorably because of his race, African-America, than were other similarly situated employees, Cynthia Casler ("Casler"), Alicia Rockwell ("Rockwell") and Joshua Bryant ("Bryan"), who are white, under nearly identical circumstances. Verrett has no personal knowledge regarding any of the events alleged in his complaint involving Casler, Rockwell and Bryant.  Verrett Dep. 85-86, 93-94, and 113-114.

**a. Cynthia Casler**.

Casler began working for TSA in 2009.  Rec. doc. 25 (Exhibit 12 – Deposition of Cynthia Casler ["Casler Dep."] at 12).  She was hired as a TSO.  At the time of her deposition, she was employed as a TSO.  Casler Dep. 12.  She had applied for promotions and other positions but she has not received them.  Casler Dep. 21.  In July 2011 and at the time of the deposition, Lundsgaard was one of her TSMs.  Casler Dep. 12 and 20.

Casler had not received verbal warnings from supervisors, letters of counseling or letters of reprimand.  Casler Dep. 13-14.  She denied that there was any occasion where she used her

badge at or near her home to get someone to move their car or for any other purpose.  Casler Dep. 14.

In July 2011, Casler approached a person in a vehicle because the person was loitering near her home for more than an hour.  It was near the time she was to leave for work.  Because her house would be empty while she was at work, she walked up and asked the person sitting in the vehicle why he was there.  Casler Dep. 15; and Bourgeois Decl. para. 10.  She was wearing her uniform because it was time to go to work.  She did not show the person her badge.  The person responded that he was a private investigator and was checking on something down the street.  Casler Dep. 15.  Casler did not tell him to move on.  Casler Dep. 16.

After the incident Carol Rochelle, Casler's supervisor, told her that someone contacted TSA about what happened near her house.  Casler Dep. 17.  The person had filed a complaint about what he thought was Casler's approach.  Casler Dep. 18.  Casler replied to Rochelle that she was just inquiring of why the man in the car was outside her home.  Casler Dep. 18.

The complaint was referred to AFSD-Law Enforcement  Robert Klipp ("Klipp") for investigation.  Klipp investigated the matter and determined that Casler did not attempt to intimidate the investigator.  Bourgeois Decl. para. 10; and Casler Dep. 19-20.  Casler was exonerated and did not receive any discipline.  Bourgeois Decl. para 10; and Casler Dep. 20.

Verrett contends that:  (1) Casler used her TSO badge in her neighborhood to get a passenger in a parked vehicle near her home to move on; (2) a complaint was filed; (3) under the Management Directive, misuse of position or impersonating law enforcement fall under the mandatory removal provisions; and (4) Casler was not terminated.  (Rec. doc. 25 at 11).

Appendix A to the Handbook lists TSO Offenses for which removal is required/permitted.  Under Part (2) there is a list of TSO Offenses for which removal is permitted for the first offense.  Subpart (l) states:

> Misuse of TSO metal badge, including impersonating a federal or other law enforcement officer, or use of the metal badge in an attempt to gain special favor or privilege.

Rec. doc. 20 (Exhibit E – Management Directive Handbook page 22).  Cases involving theft fall under Part (1)(e).  Part 1 is for TSO Offenses for which removal is required.  Unlike theft, misuse of TSO metal badge did not require removal.

The only evidence of what happened in July 2011 is Casler's deposition testimony.  She denied using her metal badge.  She admits to being in uniform as she was preparing to go to work.  Verrett did not provide the Court with a copy of the complaint by the person in the car or any report by Klipp regarding the investigation into the complaint.

Casler and Verrett both worked for TSA at Armstrong Airport.  They are both TSAs.  A complaint was made against Casler.  Whether it made any reference to misuse of badge is not known.  The Casler incident occurred in July 2011.  Verrett's incident occurred in February 2013.  Klipp, AFSD-Law Enforcement, investigated the complaint involving Casler.  Klipp had no involvement in the Verrett incident.  The TSA investigation concerning Casler exonerated Casler.  The TSA investigation concerning Verrett determined that he stole quarters from the bowl on the Supervisor's podium.

In Lee, the Fifth Circuit stated:

> If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated *accounts for* the difference in treatment received from the employer,"  the employees are not similarly situated for the purposes of an employment discrimination analysis.

574 F.3d at 260 (footnote omitted and emphasis in original).

The circumstances of the Casler incident are not sufficiently similar to those involving Verrett to require comparison of the two.  A finding of theft for Verrett versus exoneration for Casler's alleged "approach" to the person in the car more than accounts for the difference in treatment received by them.

**b. Alicia Rockwell**.

Part 1 of Appendix A of the Handbook lists the TSO offenses for which removal is required.  Subpart (f) of Part 1 lists:

> Intentionally serious security breaches, including. . . .
>
> (ii) Intentionally conducting improper screening procedures or intentionally allowing persons or property to bypass required screening.

Rec. doc. 20 (Exhibit E – Management Directive Handbook page 21).

Alicia Rockwell was not deposed.  Information concerning her TSA employment was provided by a Declaration of Carlen M. Bourgeois, the TSA Human Resources Specialist for Louisiana.  Bourgeois Decl. para. 1.

> TSA hired Alicia Rockwell as a TSO in January 2011.  On February 13, 2011, Rockwell was within her probationary 6-week training period when she was assigned to work on Checkpoint C.  That day, two passengers walked through the exit lane of the checkpoint following another TSO.  Rockwell assumed the TSO was escorting the passengers through the checkpoint, when in fact he was not; the passengers and their luggage needed to be screened.  Rockwell received a letter of counseling from her STSO, Lakitha Johnson, instructing her on proper screening procedures and the need to report any known or suspected violations of rules and regulations.  In addition, TSM Brad Meyer was responsible for Checkpoint C that day.  Rockwell resigned from her employment with TSA in May 2011 for unrelated reasons.

Bourgeois Decl. at para. 11.[8]

Both Rockwell and Verrett were TSAs at Armstrong Airport when their respective incidents occurred.  Beyond that the similarity ends.  At the time of the Rockwell incident, she

---

[8]  Lundsgaard testified in his deposition that he was not the TSM during the Rockwell incident.  Rec. doc. 25 (Exhibit 14 - Lundsgaard Dep. 29).

was employed less than six weeks and was within her training period. Verrett had been employed nearly ten years. There is no suggestion that he was unaware of the TSA policies on theft. The persons making the decisions were different. Timothy Berroyer, AFSD-S, made the decision to terminate Verrett. Lakitha Johnson, STSO, made the decision to issue Rockwell a letter of counseling. There is no evidence Rockwell intentionally allowed persons or property to bypass required screening in violation of Management Directive 1100.75-3.

   **c. Joshua Bryant**.

   Verrett contends that Bryant committed an intentional and serious security breach. He was not removed, and he was not disciplined in any way whatsoever. Rec. doc. 25 at 7.

   Bryant began his employment with TSA at Armstrong Airport on November 11, 2007 as a TSO. Rec. doc. 25 (Exhibit 10 – Deposition of Josh Bryant ["Bryant Deposition"] at 18). In May 2011, he was promoted to LTSO. Bryant Dep. 18. At the time of the deposition, he was a STSO reporting to Mutavdzic. Bryant Dep. 18.

   During his employment Bryant received verbal warnings from his supervisors but he could not recall the exact number. Bryant Dep. 19. He received letters of counseling for three incidents: (1) attendance; (2) cellphone;[9] and (3) handling a firearm. Bryant Dep. 19-22.

   He was counseled for failure to follow standard operating procedures for the firearm incident. Bryant Dep. 20-22 and 24. He stated:

   > Sometime prior to November 2009 when I was a TSO, I located and disarmed a loaded firearm in a checked bag contrary to TSA standard operating procedures, which require a law enforcement officer to disarm improperly checked firearms.

Rec. doc. 21 (Declaration of Joshua Bryant ["Bryant Decl."] para. 2).[10]

---

[9]  A passenger brought a cellphone to a Delta ticket agent, who tried to give it to Bryant. He refused to accept it. He was disciplined because it was airport policy that cellphones be turned into law enforcement. Bryant Dep. 25.

He testified that he was checking baggage. Dana Noakes and Steve Weisgerber were present. Bryant Dep. at 28. The TSM was Lundsgaard. Bryant Dep. 24. Upon opening a bag, he found a loaded firearm. He disarmed the firearm and saved it in the bag. Bryant Dep. 24. Lundsgaard came in response to a call from Romell Busch. Bryant Dep. 28-29. No passengers were in a position to see what happened. Bryant Dep. 29.

Bryant received a letter of counseling from STSO Rommel Bush and was provided remedial training on standard operating procedures. Bourgeois Decl. para. 13. Then-AFSD-S Rufus Davison informed Bryant that he would not be promoted at that time due to this incident.[11] Bryant Decl. para. 4; Bourgeois Decl. para. 13; and Rec. doc. 25 (Exhibit 9 - Deposition of Dana Noakes ("Noakes Dep.") at 28).[12]

At the time of the Bryant firearm incident, Noakes and Bryant were probationary employees. Noakes Dep. 26. She was a TSO for about four and a half years. Noakes Dep. 14. Noakes became a LTSO in December 2012. Noakes Dep. 14. Four years before her deposition, Noakes filed a complaint against TSA for race discrimination and age discrimination. Noakes Dep. 12. The month before the deposition, Noakes filed a second complaint based on being told she was ineligible for promotion because of her disability. Noakes Dep. 12.

In reference to the Bryant firearm incident, Noakes read from a written statement that she prepared after the incident. Noakes Dep. 21. She was not asked to prepare it for a TSA

---

[10]  Carlen Bourgeois, the TSA Human Resources Specialist for Louisiana, stated that the firearm incident occurred in October 2009, when Bryant was a TSO. Bourgeois Decl. para. 13.

[11] Berroyer replaced Davison as AFSD for Screening in November 2010. Berroyer Decl. para. 1.

[12]  Noakes testified that about a month and half later, Bryant was applying for LTSO. Rufus Davidson had heard about the firearm incident and told Bryant he was pulling his application for LTSO. Noakes Dep. 28.

investigation of the incident.  Noakes Dep. 25.  She thought it was an important event.  She wanted a statement for her own record.  Noakes Dep. 27.

At the time of the incident, she was in the middle of training.  Steven Weisgerber was her monitor.  There was an image on the screen that appeared to be handgun.  Through manipulation of the image from different angles, it was determined that it was a loaded pistol with a full magazine and a bullet in the chamber.  The pistol was not in a soft sided case.  It was inside a shoe.  Noakes Dep. 22.

Bryant looked at it and said "we needed to get it out."  Noakes Dep. 22.  Weisgerber said "we needed a manager."  Weisgerber said he would get Lundsgaard, who had just passed.  Weisgerber was trying to call Lundsgaard when Bryant got the bag out of the X-ray machine.  He took it to a table, where he unzipped the bag.  There was a T-Shirt and a hat that said NOPD in the bag.  Noakes Dep. 23.

Noakes said don't touch it.  Bryant responded that there should not be a loaded gun in the bag.  Noakes Dep. 23.  He picked up the handgun, unloaded it and dropped the magazine onto the bag.[13]  Weisgerber returned to get the radio.  It happened very quickly.  Noakes Dep. 24.

Weisgerber called for Lundsgaard and Romell Busch.  Bryant told Lundsgaard and Busch that he had three years of law enforcement experience and knew what he was doing.  Lundsgaard told him you never unload a gun.  You have to have a supervisor come.  Noakes Dep. 24.  Busch told Noakes and Weisgerber to leave the area and go to lunch.  Noakes Dep. at 25.  Later that afternoon Bryant bragged about getting away with the firearm incident.  Noakes Dep. at 27.

---

[13]  Noakes testified in her deposition that she feared for her safety when the loaded gun was pointed at her.  Noakes Dep. 29.  Noakes' statement is not attached as an exhibit to her deposition.  The deposition indicates that Noakes read from the statement.  Noakes Dep. 21:14-25 to 25:1-3.  As transcribed in the deposition, Noakes' written statement says nothing about Bryant pointing a loaded gun at her.

Lundsgaard testified that he did not do the investigation into the Bryant incident and he did not know exactly what Bryant did.  "I know that he was accused of handling a firearm but how much he handled that firearm, I don't know."  Rec. doc. 25 (Exhibit 14 Lundsgaard Dep. 33).  "Somebody waiving a gun around would be considered pretty scary.  I don't know that's what he did though."  Id.

The Handbook provides that the one-step removal process may be used for removals involving intentional serious security breaches.  Rec. doc. 20 (Exhibit E – Management Directive Handbook pages 9-10).   The list of TSO offenses for which removal is required includes intentional serious security breaches.  Id. page 21.  A Federal Security Director may seek an exception to mandatory removal with an explanation of the exculpatory facts and circumstances.  Id. page 21, note 1.  While Verrett urges that removal was mandatory for the firearm incident, he does not present any evidence from the supervisors, Rufus Davison and Romell Busch, who investigated the incident or any documentation from that investigation.  Verrett's evidence does not demonstrate that removal was mandatory.

The circumstances of the Bryant incident are not sufficiently similar to those involving Verrett to require comparison of the two.  Verrett was a TSO for ten years at the time of the incident leading to his termination.  Bryant was a probationary employee at the time of the firearm incident.  The Bryant incident occurred in October 2009, or more than 3.5 years before the February 2013 Verrett incident.  The supervisors who determined that Bryant would not be formally disciplined (Busch and Davison) were not involved in the Verrett incident.  Lundsgaard did not determine the employment status of Bryant.

**d. Fourth Element of Verrett's *Prima Facie* Case.**

It is undisputed that Verrett satisfies the first three requirements for a *prima facie* case of racial discrimination.  The fourth element requires that he demonstrate that he was treated less favorably because of his membership in the protected class than were other similarly situated employees who were not members of the protected class, under nearly identical circumstances. Lee, 574 F.3d 259.  Verrett's conduct was not nearly identical to that of Casler, Rockwell and Bryant.  When the criteria described in Wyvill are applied to the circumstances of the Casler, Rockwell and Bryant incidents, Verrett is not similarly situated to them.  Verrett failed to establish the fourth element of his *prima facie* case of racial discrimination.

**2. Legitimate Nondiscriminatory Explanation.[14]**

Assuming *arguendo* that Verrett can establish a *prima facie* case, an inference of intentional discrimination is raised.  The burden of production shifts to the employer, who must offer an alternative non-discriminatory explanation for the adverse employment action.  Lee, 574 F.3d at 259.

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.  To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.  The explanation provided must be legally sufficient to justify a judgment for the defendant.  If the defendant carries this burden of production, the presumption raised by the prima *facie case* is rebutted, and the factual inquiry proceeds to a new level of specificity.

---

[14]  Plaintiffs' memorandum in opposition to defendant's motion for summary judgment does not argue that Defendant has not articulated a legitimate, non-discriminatory reason for Verrett's termination.

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 1094-95 (1981) (citations and footnotes omitted).

There is no material issue of fact as to the theft.  On March 5, 2013, Berroyer, on behalf of TSA, issued a notice of removal on the charge of theft.  Rec. doc. 20 (Exhibit H – Removal File at pages 3 to 7).  The five page document clearly and with reasonable specificity sets forth the explanation for the decision to terminate Verrett.  For example, Berroyer cited a review of the video footage from February 26, 2013 which revealed Verrett approaching the Supervisor's podium, reaching into the bowl, removing items from the bowl, closing his hand, and placing his hand into his trouser pocket.  Id. at page 4.  Berroyer explained how Verrett's actions jeopardized the public trust and TSA's mission.  Id. at 5.  The notice also states how mitigating factors were considered and determined to be insufficient to mitigate the seriousness of Verrett's conduct.  Id. at 6.  Defendant demonstrates that Verrett was removed for  a legitimate, nondiscriminatory reason.

**3.  Legitimate Reason was Not-Pretextual**.

> If the employer can provide a legitimate nondiscriminatory explanation, the inference of discrimination drops out and the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for racial bias.

Lee, 574 F.3d at 259.  At this point in the burden-shifting framework, the burden is on Verrett to demonstrate that Defendant's explanation for his removal was merely a pretext for racial bias.

Defendant argues that Verrett cannot present substantial evidence that the reason is false. It contends that Verrett has no evidence that he was terminated for some reason other than theft. Defendant urges that Assistant Federal Security Director for Screening Operations, Timothy Boyer, was the deciding TSA official.  Accordingly, any evidence regarding Supervisory Transportation Security Officer Keith Osborne is immaterial.  It is undisputed that Osborne was

not the deciding official and he made no recommendation on whether Verrett should be terminated.

Verrett cites a General Accounting Office study on TSA employee misconduct that found inconsistent applications of policies. Rec. doc. 25 (Exhibit 17). Between 2010 and 2012, TSA had 56 cases of theft. Only 31 of those resulted in the removal of the employees. Rec. doc. 24 at 4. While the GAO indicates that not all TSA theft cases resulted in the removal of the employees, Verrett does not cite to any portion of the GAO report that concluded that the race of the employee was a factor in determining which employees were terminated for theft. Defendant responds that in 2004, TSA at Armstrong Airport had 12 employees (five Caucasian, six African-American, and one Hispanic) that were terminated or resigned as a result of a coordinated effort to steal items from passenger luggage. Bourgeois Decl. para. 23.

Verrett has not demonstrated that Defendant's explanation for his removal was merely a pretext for racial bias.

**4.  Notice With One-Step Removal Process**.

> In a one-step process, management must meet with the employee to discuss the incident or allegation, advise the employee of the possible consequences, and provide the employee with an opportunity to respond orally and/or in writing prior to deciding the action.

Rec. doc. 20 (Exhibit E – page 6).

In his complaint, Verrett makes no allegation concerning pre-decisional discussion in the procedures followed by Defendant in the one-step removal process. Rec. doc. 1. In response to Defendant's motion for summary judgment, Verrett submitted a one-page declaration. He reports that: (1) he had a pre-discussion meeting with some of his managers; (2) at this meeting he was not told that the possible consequences of his alleged misconduct was immediate removal from his job; and (3) had he been so informed, he would have asked for an attorney

before going forward with the meeting.  The declaration is signed and dated August 18, 2015.
Rec. doc. 25(Last Exhibit).

Lundsgaard testified that he was present with Mutavdzic to conduct the pre-disciplinary
discussion with Verrett.  Lundsgaard Dep. at 40.  Verrett was offered the opportunity to have a
witness present.  He chose Weisgerber.  Rec. doc. 20 (Exhibit H – Removal File at page 9).
Weisgerber was not deposed.  Verrett did not present a declaration from him.  Lundsgaard did
not recall if Verrett was told that he had a right to counsel.  Lundsgaard Dep. at 40-41.  He did
state that Verrett was told that he had an opportunity to respond and could have three to ten days
to do so.  Lundsgaard Dep. 42.

Defendant argues that, assuming he was not informed of the possible consequences,
there was no need to do so because the TSA policies in effect required termination in a one step
process.  Defendant further responds that Verrett did not allege in his complaint that he was
denied the due process required by Management Directive 1100.73-5.  Rec. doc. 25 – Exhibit C.
At this stage of the proceedings with the trial set for October 5, 2015, any attempt to amend to
raise a due process issue is not timely.  Rec. doc. 28 at 9.  For the reasons presented by
Defendant, Verrett's argument about the alleged lack of notice during the pre-decisional meeting
is without merit.

## Conclusion

For the foregoing reasons, the undersigned finds that while Verrett's allegations do meet
the first three factors necessary to make a *prima facie* showing, he does not meet the fourth
factor:  He has failed to show he was treated less favorably (because he is a member of a
protected class) than others not in the protected class under nearly identical circumstances.  The
motion of the Defendant is therefore well-founded and accordingly;

IT IS ORDERED that the motion of defendant, Jeh Johnson, Secretary of the Department of Homeland Security ("Defendant"), for summary judgment (Rec. doc. 19) is GRANTED.

New Orleans, Louisiana, this 1st day of September, 2015.

**SALLY SHUSHAN**
**U.S. Magistrate Judge**